Springer, J.,
dissenting[1]:
Condemnees have presented to the court documents which, if given due credit, would not under any circumstances allow for Justice Rose’s continued participation in deciding these consolidated cases. Refusing to deal with the merits of the documents themselves, the court has simply “returned” the documents “unfiled” to condemnees’ counsel.
There is no valid excuse for the court’s actions, but the excuse offered by the court for returning the documents is that the documents are “serial” and thus contrary to NRAP 35(d). “Serial” simply means appearing in successive parts; so that if the condemnees had offered a new, “successive” motion, such a new motion might be described as being serial. This is not the case however. The documents returned as being “serial” merely respond to charges that became a part of these present proceedings by virtue of Justice Rose’s actions, namely, Justice Rose’s filing of his “Supplemental Response” to condemnees’ motion to disqualify him. Condemnees cannot be expected to sit by and let Justice Rose’s “supplemental” response stand unchallenged. If Justice Rose’s “supplemental” response is not successive or serial, then certainly condemnees’ reply to Justice Rose is not successive or serial. Plainly and simply, it is not fair for the court to consider Justice Rose’s supplemental document and to return the condemnees’ reply to that document to the condemnees, “unfiled.”
Justice Rose is clearly disqualified to sit in these condemnation actions by reason of his admitted and openly-expressed bias against Laura FitzSimmons, who is not only one of the lawyers for the condemnees but is herself a financially interested party.
*1107 Justice Rose has filed a Response and a Supplemental Response in which he maintains that his bias is against Ms. FitzSimmons alone and not against any of the named conde-mnees. Ms. FitzSimmons has lodged with the court a Reply to the Rose documents in which she establishes her position as an interested party in this lawsuit, thus having the right as a party, to have Justice Rose removed from these cases. Ms. FitzSimmons’ position is firmly documented and supported by authorities; and there is absolutely no question that Ms. FitzSimmons’ financial interest in the outcome of these cases entitles her to have Justice Rose removed from the cases. The only way in which Chief Justice Shearing, Justice Young and Judge Papez could possibly rule in favor of Justice Rose under these circumstances would be for them to accept Justice Rose’s opposition documents and at the same time refuse to file Ms. FitzSimmons’ Reply. Incredibly, the three mentioned jurists have done just this and have taken the position that although Justice Rose has the right to “tender a response in writing to [the] motion for disqualification,” they will not “permit the filing of a reply to the response tendered by a challenged justice.” In other words, they will listen to what Justice Rose has to say, but they will not listen to what Ms. FitzSimmons has to say. Even though they realize that the FitzSimmons document dictates the granting of condemnees’ motion to disqualify Justice Rose, they “decline to entertain the arguments in that document.”
Chief Justice Shearing, Justice Young and Judge Papez, after carefully considering the documents presented by Justice Rose, rule that Ms. FitzSimmons’ opposing arguments “obfuscate the issues” and “delay the final resolution of these matters” — insufficient reason, I think, for refusing to consider materials which they know would require them to grant the motion to disqualify rather than to deny it. Rather than give formal recognition to facts that they are already aware of informally, the three jurists of the majority have ordered the clerk to “return the [FitzSimmons’] documents unfiled.”
Chief Justice Shearing, Justice Young and Judge Papez are all on notice of the thrust of Ms. FitzSimmons’ position (namely, that she is a party and that the law requires that Justice Rose be disqualified by reason of his expressed bias against her) and know that if the documents were not returned unfiled they would be compelled to grant the motions to disqualify Justice Rose. The only way that these three could avoid the clear necessity for disqualifying Justice Rose was to do what they did and to “return the documents unfiled.”
I will argue in this dissent that even though the mentioned *1108 majority of the court has decided not to consider the dispositive arguments offered by Ms. FitzSimmons, the moving documents that the court is willing to consider still demand the disqualification of Justice Rose because Justice Rose’s expressed bias toward Ms. FitzSimmons, as an attorney, is “extreme” and because Justice Rose has made impermissible public comments on the fundamental issue that is before the court in these condemnation proceedings. The arguments which I present in this dissent do not, however, have nearly the persuasive value as do the lengths to which Justice Young (who himself was subject to removal proceedings in these cases, only to be ruled qualified by his colleague, Justice Rose) and Justice Rose have gone to in order to keep Justice Rose in these cases. This speaks for itself. That the majority justices would go so far as to refuse to consider the condemnees’ absolute refutation of the arguments made by Justice Rose in his Supplemental Response should convince any reader that there is something amiss in this whole proceeding. The cloud of Justice Rose’s continuing to act as a judge in these cases should not be allowed to contaminate these cases and to create questions about the integrity of this court.
The majority’s excuse for sending the condemnees’ papers back to them is that they are required to do so by NRAP 35(d). This, to my mind, is pretense; but even if their reliance on NRAP 35(d) could be seen as being supportable, basic fairness would require that the condemnees in these cases be heard and that the court not rely entirely upon the unanswered documents of Justice Rose. Issues of fundamental fairness aside, it is clear that NRAP 35(d) does not justify their actions. As pointed out in the majority opinion, NRAP 35(d) prohibits the filing of “serial motions or charges.” Ms. FitzSimmons presents no serial “motions or charges” in these cases. All Ms. FitzSimmons was trying to do was to respond to Justice Rose’s arguments. Justice Rose presented to the court two laborious Responses, arguing that his bias against Ms. FitzSimmons, as an attorney, was not so “extreme” as to require his disqualification. The documents now returned to Ms. FitzSimmons merely point out that Justice Rose’s bias does not have to be “extreme” if in addition to being an attorney she is a principal and financially interested in the outcome. There is nothing “serial” about Ms. FitzSimmons’ natural response to Justice Rose’s arguments; and I can see no conceivable reason for the court’s present decision to silence Ms. FitzSimmons and to return her papers unfiled.
Having stated as my primary disagreement with the order denying condemnees’ motion to disqualify Justice Rose the arbitrary decision by Chief Justice Shearing, Justice Young and Judge Papez to silence the condemnees’ attempts to oppose *1109 the arguments that Justice Rose makes on his own behalf, I will proceed now to discuss the issues that were considered by the majority, namely, the effect of Justice Rose’s making public comments on the ultimate issue to be decided in these cases and Justice Rose’s “extreme” bias against Ms. FitzSimmons.

JUSTICE ROSE’S PUBLIC COMMENT ON PENDING CASES

As appears in the majority opinion, Justice Rose discussed the ultimate issue in these appeals, namely, that of “redefining the term ‘fair market value.’ ” He discussed this subject in some manner with “several” legislators. The majority tells us of at least two, Senator Adler and Senator Smith. Canon 3(B)(9) of the Nevada Code of Judicial Conduct prohibits judges from making public comments on pending or impending proceedings. As stated in the majority opinion, certain legislators “conferred with Chief Justice Rose regarding this question.” I do not believe that such conferences are permitted by Canon 3(B)(9).
There are two versions of Justice Rose’s conference with legislators. As appears from the majority opinion, the con-demnees claim that “Justice Rose prejudged an issue before the court and gave an advisory opinion concerning ... the definition of the term ‘value’ to be used in condemnation cases.” Justice Rose, on the other hand, tells us that the mentioned conference was comprised of a series of telephone calls from various legislators who were merely “extending a courtesy” to Justice Rose as chief justice and discussing forthcoming plans of the legislature “to see if a better definition to the term ‘fair market value’ could be achieved.” Justice Rose does not “recall” a specific “conversation of what the new definition would be.”
The conflict in positions between the challenged justice and the condemnees is precisely the type of conflict that Canon 3(B)(9) was designed to prevent. The Canon tells judges not to “make any public” comment that might be expected to impair the fairness of the pending case. (My emphasis.) If Justice Rose had declined to make any comment on matters that he knew were pending before this court, he would not have faced this controversy. The majority resolves the controversy simply by accepting the position of their colleague, Justice Rose, and by rejecting the position of the condemnees. This is not a fair way to treat litigants — deciding controversies of this kind in favor of one of their fellow court-members without any further exploration of the condemnees’ position. Further, it does not matter to me whether Justice Rose’s conference with legislators took place in the manner that he describes it or whether it took the form claimed by the condemnees — in either event, Justice Rose is guilty of *1110 making public comments on pending litigation. To my way of thinking, such a conference impairs the fairness, or at least the appearance of fairness, in these cases. Justice Rose should disqualify himself. Based on the application of Canon 3B(9), I dissent to the order denying the motion to disqualify Justice Rose.

JUSTICE ROSE’S BIAS TOWARD ATTORNEY FITZSIMMONS

Condemnees’ motion to disqualify Justice Rose is also based on Justice Rose’s biased attitude toward one of their attorneys, Laura FitzSimmons. The majority states that it will “elect to follow our holding in Las Vegas Downtown Redev. Agency v. Hecht, 113 Nev. 632, 940 P.2d 127 (1997). In Hecht, a motion similar to the one in these cases was filed, in which the bias of Justice Rose against attorney FitzSimmons was raised. It is not claimed by the majority that the Hecht case is res judicata or that the condemnees in these cases, different parties entirely from those in the Hecht case, are precluded from raising the issue here. It is my belief that the circumstances surrounding Justice Rose’s statements and treatment of Ms. FitzSimmons undeniably call for Justice Rose’s removal from these cases.
My dissent is based in large part upon the documents filed by Justice Rose in Whitacre on February 4, 1997, and in Buckwaiter and C.B.M. on February 7, 1997, entitled “Response of Justice Rose to Motion to Disqualify Him and Request that Justice Springer Not Participate in Deciding the Motion to Disqualify.” In the mentioned Response, Justice Rose accuses condemnees’ counsel, Laura FitzSimmons, of being part of an ongoing conspiracy against Justice Rose, which he calls a “GuNDERSON/Whitehead/SpRiNGER/STEFFEN coalition.” The Rose Response is comprised of a long bill of personal complaints by Justice Rose against Ms. FitzSimmons and against the mentioned conspiratorial coalition, including charges that Ms. FitzSimmons was part of a plan to make public sealed criminal charges that had been filed by a Las Vegas Metropolitan Police officer against Justice Rose, and that, had it not been for Ms. FitzSimmons and her co-conspirators, these charges would have been kept from the public eye and remained “sealed” by order of the district court in Las Vegas.
Ms. FitzSimmons denies that she is part of any such conspiracy; but it is obvious from Justice Rose’s document that he earnestly believes that Ms. FitzSimmons is conspiring to destroy him. In my judgment, these beliefs and the other charges which Justice Rose makes against Ms. FitzSimmons create a strong appearance of bias on the part of Justice Rose and lead to the almost inescapable inference that it is impossible for Justice *1111 Rose to sit in impartial judgment in these cases while Ms. FitzSimmons is acting as counsel.
Justice Rose resists his disqualification by claiming that although, under Canon 3(E) of the Code of Judicial Conduct, “a judge can be disqualified for animus toward an attorney,” Justice Rose does not consider his “animus” to be sufficiently virulent and “extreme” to warrant his disqualification. Any reader of Justice Rose’s Response will come to the unhesitating conclusion that Justice Rose’s bias against Ms. FitzSimmons is indeed extreme and that there is virtually no possibility that a judge who feels the way that Justice Rose feels about Ms. FitzSimmons could possibly sit in fair judgment in these cases.
In the mentioned Response, Justice Rose makes two arguments. The first is that deference should be given to his own “opinion as to bias” and that although his past “remarks” about Ms. FitzSimmons may have been derogatory and hateful, he has an excuse, namely, “Justice Rose’s remarks were made in response to statements or actions of Laura FitzSimmons” and were, for this reason, “not evidence of any disqualifying bias.”
With regard to Justice Rose’s argument that retaliatory remarks made “in response” to attorney FitzSimmons’ “attacks” on him do not count, I must say that I have never heard such an argument before. Justice Rose tells us that because the things he has said about Ms. FitzSimmons[2] were in retaliation for and “in response” to the bad things that he claims Ms. FitzSimmons had done and said about him, his “remarks” cannot be admitted as “evidence of any disqualifying bias.” Although this is a very interesting position for Justice Rose to take, I fail to see any merit to his claim that he was merely acting in retaliation for past grievances. Frankly, I cannot understand his claim that his acting “in response” to perceived indignities does not constitute “evidence of any disqualifying bias.” As I see it, Justice Rose’s claim that his retaliatory “remarks” do not count because he was provoked into making them is just more evidence that he is truly and “extremely”[3] biased against Ms. FitzSimmons.
Attorney FitzSimmons’ response to the charges made by Justice Rose in his Response is put this way: “Since Justice Rose *1112 continues to express his opinion that I am part of a ‘coalition’[4] that is intent upon harming him politically, a reasonable person would certainly question whether Justice Rose would hold the balance nice, clear and true.”
It is worthwhile to examine some of the public charges that Justice Rose has levied against Ms. FitzSimmons. I might understand Justice Rose’s position better if Ms. FitzSimmons had, as Justice Rose claims, actually slandered Justice Rose or had intentionally provoked him or taunted him. It would then be much easier to understand Justice Rose’s extravagant attack and the statements that he has made about her. For example, in his Response, Justice Rose itemizes a number of “legal and political actions taken by FitzSimmons against Justice Rose,” including an “independent civil action by FitzSimmons” against Justice Rose. Still, among the many “actions” by Ms. FitzSimmons complained of by Justice Rose I find no untoward or unfair conduct of any kind on the part of Ms. FitzSimmons; nevertheless, it is understandable, to a limited degree, why Justice Rose (if he believed all of the “reliable sources” referred to in his Response) got so angry at attorney FitzSimmons and why, as he puts it, he “has not appreciated these attacks or her conduct.”[5]
I believe the key to judging Justice Rose’s bias or lack of it in these cases is his assertion that his “responsive statements” were *1113 “precipitated” (provoked) by “attacks against him” that became known to him based upon undisclosed “reliable information made available to him.” The information available which Justice Rose claims to have gotten from unnamed sources might have disclosed to Justice Rose some conduct which he deemed to be inappropriate on the part of Ms. FitzSimmons; but there is certainly nothing in the record that would support such a conclusion.
It is apparent from Justice Rose’s Response that the perceived “attacks” by Ms. FitzSimmons that “precipitated” Justice Rose’s “responsive statements” against Ms. FitzSimmons are centered on what Justice Rose describes as Ms. FitzSimmons’ filing of a “civil complaint to require the Eighth Judicial District Court in Clark County to make public certain wiretapped conversations of Justice Rose surrounding the criminal investigation of Michael and Rhonda Mushkin” and Justice Rose. Justice Rose attaches to his Response a copy of Ms. FitzSimmons’ “civil complaint,” which is a “Petition to Unseal Wiretap Information.” This document discloses that a district judge had, in a secret proceeding entitled “DR# 92-0919-1101,” ordered that certain police files relating to Justice Rose, Michael Mushkin and Rhonda Mushkin be sealed and withdrawn from public view. I will not speculate about what political forces might have been exerted to bring about the unheard-of action of a district judge’s ordering that certain police files be “sealed,” nor will I speculate on why the district court did not grant Ms. FitzSimmons’ motion to “unseal” these public records; but I will say that there does not appear to be anything untoward or provocative about Ms. FitzSimmons’ motion to unseal, which, she advises the court, was made for the purpose of “preparing various documents for filing” and was based on the Nevada Public Records Act (NRS 239.010). What is untoward and what should provoke any citizen is the fact that Ms. FitzSimmons’ request for inspection of public documents was not granted, especially when the Las Vegas Metropolitan Police and the district attorney of Clark County consented to the “unsealing” of these public documents.
In her Reply, Ms. FitzSimmons explains that the purpose for her filing the mentioned Petition was to obtain documents in support of a complaint to the Nevada Commission on Judicial Discipline, pursuant to what she believed to be her ethical obligation, and not, as Justice Rose has asserted, to “make public those conversations.” Attorney FitzSimmons tells us that the discipline complaint was held by the Commission, the executive director of which Justice Rose has described as one of his “closest friends,” until this court decided Hogan v. Warden, 112 Nev. 553, 916 P.2d 805 (1996). Thereafter, the complaint was *1114 dismissed by the Commission, which justified the dismissal entirely upon that opinion, in which Justice Rose sat in judgment of issues relating to his own alleged misconduct.
Part of the information contained in the sealed documents referred to above became public despite the court order sealing it; and the source of Justice Rose’s displeasure with Ms. FitzSimmons appears to be that he blames her for trying to make public documents public, documents described by Justice Rose in his Response as being wiretapped conversations in which “I [Rose] was a party concerning the criminal investigation into the activities of Michael and Rhonda Mushkin. Michael and Rhonda Mushkin were indicted after a lengthy investigation, and I had one or more conversations with Rhonda that were intercepted by wiretapped surveillance. These wiretaps were transcribed for the state’s prosecution of Michael Mushkin but were subsequently sealed by the Court.”
It is understandable that Justice Rose would have been concerned about these wiretaps’ becoming public knowledge and especially concerned when, for the first time, it appeared in the newspapers that Justice Rose was the subject of a sworn criminal complaint charging him with obstruction of public justice and seeking his arrest. Even though the district attorney refused to prosecute the criminal complaint and Attorney General Del Papa also “declined to prosecute” the criminal complaint, if Justice Rose believed that this embarrassing public disclosure was brought about by the “intentional actions” of Ms. FitzSimmons and her “coalition,” then it does explain why he feels the way that he does about her and explains why he was moved to make “responsive statements” about Ms. FitzSimmons. What it does not explain, however, is how, given the kind of “animus” against Ms. FitzSimmons that is demonstrated by Justice Rose in his Response, he can be expected to act fairly and impartially in these cases.
Justice Rose’s public comments on the dispositive issue in these cases and his “extreme” animus toward counsel demand that he be disqualified from sitting in these cases.

CONCLUSION

The decision to deny the motion to disqualify Justice Rose is additionally clouded by the fact that the deciding vote is cast by Justice Young, who, himself, was challenged for bias in these cases. The way that the challenges against Justice Young and Justice Rose have been resolved in these cases is simply that Justice Rose casts the deciding vote that Justice Young is not biased; and now Justice Young casts the deciding vote ruling that Justice Rose is not biased. This procedure is tainted and *1115 unfair on its face, remindful of the time when Justice Young and Justice Rose decided a case in which they had been previously disqualified. Whitehead v. Comm’n on Jud. Discipline, 920 P.2d 491 (1996).[6]

 Movants’ counsel claim that this motion has become moot by reason of the Governor’s designations of Judge Dan L. Papez, issued on June 5, 1997. The Governor’s designations (on file in all three of the captioned cases) recite that “Justice Robert E. Rose has voluntarily disqualified himself to sit as a Justice of the Supreme Court of Nevada” in these cases and that Judge Papez was designated to sit in Justice Rose’s place. On the face of this document, it would appear that the motion to disqualify is moot; however, given that the court’s request to the Governor was for a designation only “to assist the court in deciding the disqualification motions,” it is clear that Justice Rose disqualified himself only from matters relating to the disqualification motions and, notwithstanding the language in the Governor’s designation, has not disqualified himself in these cases.

 In the motions to disqualify Justice Rose, Ms. FitzSimmons sets out an array of derogatory statements that Justice Rose has made in public against her over the past several years. I find no need in this opinion to catalogue these statements and merely note that Justice Rose does not deny making these remarks. His position is one of confession and avoidance — “Justice Rose’s remarks were in response to the statements or actions of Laura FitzSimmons” and, therefore, “are not evidence of disqualifying bias.”

 See Richard E. Flamm, Judicial Disqualification 124 (1966).

 According to Justice Rose’s Response there is a “coalition” comprised of movants’ attorney, Laura FitzSimmons, former Chief Justice E. M. Gunderson, former Chief Justice Thomas Steffen, former Judge Jerry Whitehead and, the undersigned, Justice Charles Springer. According to Justice Rose, “based on what [he] considered reliable information,” the members of the named conspiracy have been conspiring against him in the form of “legal and political action.”

 While admitting that he has not “appreciated” all of the things that he claims have been done to him by Ms. FitzSimmons and despite the tone of ire and displeasure that runs throughout his Response, Justice Rose writes in his Response that he “had always considered [him] self to be a good friend of Laura FitzSimmons.” Ms. FitzSimmons’ sworn response to this is as follows:
I do know that I have never considered Justice Rose to be a friend. Indeed the only conversation of a personal nature that I recall having with Justice Rose was a fund raiser that I hosted for him in Carson City during his first campaign. The guests left, and Justice Rose and I were sitting outside. He was complaining about how strenuous the campaign had been. I told him that I thought it would be hard to campaign for a judgeship, and later resist the temptation, as a judge, to reward friends and punish enemies. Justice Rose looked me in the eye and replied that he was not one to resist temptation, and he was looking forward to pay backs. I was uncomfortable with that statement at the time it was made, and later events have only increased my concern.

 In arguing at such length that Justice Rose’s bias against Ms. FitzSimmons, as an attorney, is “extreme” and therefore sufficient to disqualify him, I do not want to leave the impression that I believe that “extreme” bias is necessary in these cases. Ms. FitzSimmons is an interested party in these cases and, as such, it is not necessary to establish “extreme” bias against her. As I have argued above, if this court were to have given due consideration to the supplemental motion and supporting documents, as it properly should, the court would have been hard pressed, in good conscience, to deny the motion to disqualify Justice Rose and thereby permit Justice Rose to continue to sit in these cases.
By failing to consider the condemnees’ supplemental motion, the majority is ignoring a dispositive point raised by the condemnees, namely, that Ms. FitzSimmons is not only attorney for condemnees, she is, herself, indisputably, a real party in interest.
In Hecht and in these cases, the court rules in favor of Justice Rose (who calls himself a “real party in interest”) on the ground that Justice Rose’s frequently-expressed bias and ill-will toward Ms. FitzSimmons was not so excessive as to be extreme bias. The rule of “extreme bias,” has, of course, no application to Ms. FitzSimmons as a real party in interest, and one who is subject to losing large sums of money if Justice Rose’s admitted bias against her is allowed to come into play. (Justice Rose states in his “Supplemental Response” that “[a]s a practical matter, the real parties in interest are Justice Rose and attorney Laura FitzSimmons . . . .”) This being the case, the majority in these cases acted mistakenly in holding that disqualification was not mandated except where the bias could be shown to have been “extreme.”
It is not fair for this court to have decided the present motion without considering the matters which were called to the court’s attention in the supplemental motion that it has refused to consider and returned to the movants. In addition to calling attention to the fact of Ms. FitzSimmons’ being, like Justice Rose, a real party in interest, the supplemental motion raised a number of other critical matters that should have been considered by the court. For example, contained in the moving papers is an opinion, in affidavit form, expressed by Richard Edward Flamm, the leading authority on judicial disqualifications, an opinion which “mandate[sj” Justice Rose’s disqualification. Mr. Flamm is the author of Judicial Disqualification: Recu-sal and Disqualification of Judges, a nationwide treatise published by Little, Brown and Company in 1996. The treatise examines in detail the principles which have been espoused by the nation’s courts in deciding judicial disqualification motions and appeals. This court relied (incorrectly) on two sections of Mr. Flamm’s treatise in its opinion denying the motion to disqualify Justice Rose in Hecht.
After a careful review of Hecht and of all the pertinent documents in the present case, “as well as a host of cases on point,” Mr. Flamm expressed, under oath, the following professional opinions:
I have formed the opinion that Justice Rose’s expressed animus towards Ms. FitzSimmons does indeed mandate his disqualification from this case .... I do not believe that this general proposition (that a judges’s bias against an attorney must be “extreme”) justifies Justice Rose continuing to sit in cases in which Ms. FitzSimmons represents a *1116 party on a contingent fee basis. ... In her moving papers Ms. FitzSimmons attested (and Justice Rose did not deny) that she has a pecuniary interest in the outcome of these proceedings. ... In my opinion, a real party who possesses a substantial interest in the outcome of a proceeding has a due process right not to have that case decided by a court whose membership includes a judge whose impartiality might reasonably be questioned.
For this court to decide this matter without having considered the vital matters presented in the supplemental motion is completely without justification.